Krupp *v.* Krupp, Appellant.

Argued April 25, 1928.

Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ.

*Wm. J. Graham,* for appellant.

*Howard Zacharias,* for appellee.

OPINION BY PORTER, P. J., October 1, 1928:
This is an action for divorce from the bonds of

matrimony. The libel originally filed by the appellee, on May 7, 1926, averred that the respondent had wilfully and maliciously deserted the libellant, without reasonable cause, and had continued such wilful and malicious desertion for a space of two years last past and upwards. The respondent filed an answer denying that he had deserted libellant and averring that the desertion had been by the libellant and, in addition, averred that the libellant had committed adultery with one Walter J. Multer. The libel of the appellee was amended, on February 9, 1927, and, as amended, averred that the respondent had by cruel and barbarous treatment endangered the life of the libellant and had offered such indignities to her person as to render her condition intolerable and life burdensome. The respondent entered a rule on libellant to file a bill of particulars, which the libellant accordingly filed. This bill of particulars averred that the respondent had deserted libellant, at their residence in Brushton Avenue, Pittsburgh, in November, 1923, and had persisted in said desertion down until the filing of the libel. It further averred that the respondent had been guilty of indignities to the libellant by making false charges, calling her a whore and a prostitute and asserting that she had been guilty of adultery with certain men and continued in this practice up to the time of their separation, making such charges in the presence of the children and the friends and relatives of the libellant, and that the respondent had persisted in harrassing and annoying her after his desertion, at the place of business where she worked in order to support herself and her two children; that he continuously asserted to libellant and others that he was not the father of the younger of the two children and that he had called her vile and obscene names. The respondent filed an answer to the bill of particulars in which he denied that he had wilfully and maliciously deserted the libellant. In

this answer to the bill of particulars he admitted that he had, in August, 1923, filed a libel in divorce charging that the present libellant, the respondent in that proceeding, had been guilty of adultery with one Mc-Quillan but that thereafter the suit had been discontinued and the parties had resumed marital relations. It thus appeared, in the pleadings, that the defendant admitted that he had charged the libellant with having adulterous intercourse with Walter J. Multer and with McQuillan.

The case was heard by a learned judge of the court below upon evidence presented in open court and after such hearing and consideration of the evidence the court entered a decree finding (1) that the respondent had wilfully and maliciously deserted libellant and persisted in said desertion for a period of two years and upwards and (2) that the respondent had offered such indignities to the person of the libellant as to render her condition intolerable and life burdensome and decreed that the libellant be divorced and separated from the bonds of matrimony contracted between libellant and respondent. The respondent appeals.

The testimony in this case having been taken in open court and the learned judge before whom the witnesses appeared having had an opportunity to observe their manner of testifying, and the evidence produced by the libellant being clearly sufficient to warrant the entry of the decree appealed from, the findings of fact by the court below are entitled to respectful consideration. With regard to the charge of wilful and malicious desertion the evidence was conflicting. The parties had separated, in March, 1923, because of the persistent charges of the respondent that the wife was guilty of adulterous intercourse with McQuillan. These charges were made in the presence of libellant's mother and the libellant endured them for a period of several weeks before finally

leaving the common home, taking with her the two small children, and went to the home of her mother, where she lived for a few weeks. She then obtained a position as a waitress in the Childs restaurant in order to earn money to support herself and the children, the respondent not having been contributing to their support. She then took with her the children and went to live in the home of her sister, on Brushton Avenue, Pittsburgh, continuing to work at the Childs restaurant. In August, 1923, this respondent filed a libel in divorce against the present libellant charging her with adulterous intercourse with Mc-Quillan. The parties became reconciled, the divorce proceeding which this appellant had instituted, was discontinued and they resumed marital relations, in October, 1923, living at the house of libellant's sister on Brushton Avenue, and there remained for about five weeks. They got along peaceably for the first three weeks, after which the appellant began again to accuse his wife of being guilty of adulterous practices, this time with the Greek employes at the restaurant where she worked, but he still continued to live with his wife in the Brushton Avenue house, for about two more weeks, at the end of which period the final separation came. The libellant testified that on a Friday night, in November, 1923, the respondent was taking her home from the Childs restaurant in his automobile and started to abuse her about different men calling on her in Allentown, where they had lived five years before, and also accused her of misconduct with those Greeks employed at the Childs restaurant, and that he then told her that was the last he was going to have anything to do with her; that he stayed with her that night and that when he got up in the morning he said, ''I am going and don't ever expect me back again''; that he said, ''The hell with you, I am through with you and everything that belongs to you''; that he then took some of his clothes and

said he would return on Sunday for the rest; she testified that, "He returned the next day, Sunday, came into the house, took the rest of his clothes to the automobile, came back after his victrola and took it, bag and baggage, and said he wouldn't let us have anything that he would buy that was his." She testified that he never afterwards made any offer of reconciliation and that he contributed nothing to the support of her and the two small children until she went into the County Court and obtained an order for the payment of $11.00 a week. Josephine McAfee, a witness called by libellant, testified that on the day the respondent finally left the home on Brushton Avenue, the defendant said he came back for his clothes and he was leaving and that his wife said, "If you are leaving, don't ever expect me to take you back," and that the respondent said to her, "To hell with you and everything that belongs to you"; that the respondent said to his wife, "You are only a waitress, and all waitresses are whores." The testimony of the respondent as to what occurred at the time of the final separation was, in substance, that on the afternoon of the day upon the night of which he last took his wife home from work, he was over in Dormont and had a talk with Mr. and Mrs. Webster who told him that while libellant and respondent were living on West Liberty Avenue, a man named Fred Miller called on his wife continually every day and that the driver of a laundry wagon left his truck stand in the front of the house longer than was proper. He testified that the same evening he met a Mr. and Mrs. Waas, on Smithfield Street, and that "they told me about this man Fred Miller calling on my wife while I lived in Allentown in 1918." He testified that what these people told him "utterly destroyed his happiness." He testified that when taking his wife home from work that night he told her what these people had said. When asked how he was then he said, "I

was mad"; that he said to his wife, "Rachel, this is terrible." He testified that the libellant denied all these charges. He further testified that notwithstanding all that he had heard he was willing to forgive his wife and resume marital relations, but that he did not remain at the home that night but it was agreed between them that he should come back on Sunday and let bygones be bygones and his wife was at that time to give him her answer whether she would go back to the house in Dormont and resume marital relations. He testified that when he went back on Sunday the sister of libellant would not permit him to enter the house, but handed him his bag containing his clothing and told him his wife didn't want to have anything to do with him. This latter testimony was contradicted by the libellant and by Miss Josephine McAfee. It thus appeared that there was a direct conflict of testimony as to the final breaking off of relations; upon one side was the testimony of the libellant and Miss McAfee and upon the other that of the respondent alone. We are convinced, in the light of the pleadings and all the evidence, that the testimony of this respondent is not entitled to credit. In his pleadings he had specifically charged that the libellant had been guilty of adultery with both McQuillan and Walter J. Multer, yet the only evidence which he produced of such misconduct was his own assertion that his wife had admitted that she had been guilty of adultery with McQuillan and that McQuillan was the father of the younger child. The libellant testified that she had never made such an admission. The respondent testified that certain facts had been communicated to him by Mr. and Mrs. Webster and by Mr. and Mrs. Waas. He called Mrs. Webster as a witness and when that lady was asked if she had had a conversation with Mr. Krupp, on or about November 10, 1923, she replied, "I had no conversation with Mr. Krupp at our house, when he came over to talk to Mr. Webster. I don't

know what you refer to. I don't know of anything." This witness was not asked by counsel for the libellant and did not testify as to any fact or circumstance which would tend to cast suspicion of misconduct on the part of this libellant. Mr. Webster was not called as a witness, nor were Mr. and Mrs. Waas. If these parties knew of any fact which might tend to justify the suspicions of this respondent of misconduct upon the part of his wife, then the respondent ought to have called them as witnesses. The fact that the respondent did not call these parties as witnesses, coupled with the fact that Mrs. Webster who was called was not asked any question concerning misconduct on the part of the libellant, would certainly cast doubt upon the assertion that these parties had told him anything which could warrant him in making the charges made against the libellant. Mature consideration of the entire record and testimony has convinced us that the learned judge of the court below did not err in believing the testimony of the libellant and her witnesses, which clearly established that the respondent had deserted his wife, without reasonable cause, and persisted in such desertion for the space of two years and upwards, and that the decree of the court below was properly entered.

Even if the separation of the parties had been due to the refusal of the libellant to live with her husband, the overwhelming weight of the evidence clearly established that he had been guilty of such indignities to her person as to render her condition intolerable and life burdensome, thus justifying her in refusing to further cohabit with the husband, and entitling her to a divorce upon that ground. No single act of indignity to the person is sufficient cause for a divorce; there must be such a course of conduct or continued treatment as renders the wife's condition intolerable and life burdensome. The indignities need not be such as to endanger life or health; it is sufficient if the

course of treatment be of such a character as to render the condition of any woman of ordinary sensibility and delicacy of feeling intolerable and her life burdensome: Krug v. Krug, 22 Pa. Superior Ct. 572; Donnelly v. Donnelly, 76 Pa. Superior Ct. 92; Breene v. Breene, 76 Pa. Superior Ct. 568, and many authorities there cited. That this respondent had by a continuous course of treatment extending over a period of several months, prior to the separation, persisted in charging his wife with adulterous intercourse with other men and that he continued to make such charges after the separation, going to the establishment where she was employed as a waitress and there telling other employes that the libellant was a whore and a prostitute; and continuing this system of persecution down to and after the filing of the libel in this case, is clearly established by the evidence. Mrs. Elizabeth Anderegg, an apparently impartial witness, testified that she was employed at the same restaurant at which the libellant was working, and that after libellant and respondent had separated, the latter came into the restaurant and had his dinner at a table upon which the witness waited; that the respondent then said to her, "If you girls knew what Rachel was, you wouldn't associate with her; she isn't anything but a bad actor. She runs around with a boy and she has had him at our home and broke up my home and she will lead you astray too. Don't associate with her, she isn't anything but a whore." Mrs. Bertha Haddock, who was also employed at the establishment where the libellant had been working, testified that one evening as she was on her way to her home, after finishing her work, this respondent stopped her upon the street and said, "I want to ask you something about Rachel, ...... I heard she goes out with the managers and the help that works in there." The witness testified as follows: "I told him I didn't know anything about Rachel, only that she was a good woman and he said

'Well, then, she must have reformed.' '' This witness further testified, referring to the respondent, "He said she (his wife) kept a young man coming to the house and she had wrong doings with him and she was no good to him or she wouldn't have him coming there and he said the baby didn't belong to him." This testimony by witnesses who seemed to be entirely impartial corroborated the testimony of the libellant and her relatives, and although it was flatly contradicted by the respondent, we are convinced that the libellant and her witnesses told the truth. That this respondent had for months continued to charge his wife with having adulterous intercourse with other men is, also, clearly established by his own course of conduct. He filed a libel in divorce, in August, 1923, charging his wife with adultery, which libel he subsequently withdrew; and in the present proceeding he had in his answer to the libel and bill of particulars distinctly averred that she had been guilty of adultery with two men, yet, having made these specific charges, he failed to produce any credible evidence whatever which could be held to indicate that his wife had been guilty of any misconduct. That such a course of conduct on the part of a husband would render the condition of any decent woman of ordinary sensibility and delicacy of feeling intolerable and her life burdensome and justify her in refusing further cohabitation seems to be too clear to require extended discussion.

The decree is affirmed and the appeal dismissed at cost of the appellant.